Gordon Law LLP
Michael R. Gordon, Esq.
51 Bedford Road, Suite 10
Katonah, New York 10536
Telephone:   914.232.9500
Fax:              914.992.6634
Email:           mgordon@gordonlawllp.com
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------

BEYOND BESPOKE TAILORS, INC. and NICK TORRES

        Plaintiffs,

        -against-

JAMES BARCHIESI, WORKSITE LLC, WORKSITE ACCOUNTANTS AND ADVISORS, WORKSITE CAPITAL PARTNERS, LLC, WORKSITE INTERACTIVE LLC, WORKSITE VENTURES, and ROTH & ASSOCIATES,

        Defendants.

Civ. No. 1:20-cv-05482

**Complaint**

**Jury trial demanded by Plaintiff**

------------------------------------

Plaintiffs Beyond Bespoke Tailors, Inc. ("BBT") and Nick Torres ("Torres"), by and through their attorneys, GordonLaw LLP, as and for their Complaint, allege against Defendants James Barchiesi, Worksite LLC, Worksite Accountants and Advisors, Worksite Capital Partners, LLC, Worksite Interactive LLC, Worksite Ventures and Roth & Associates (collectively "Defendants"), as follows:

### NATURE OF THE CASE

1.     This is an action for fraud, breach of contract, and breach of fiduciary duty.

2. Plaintiff BBT is one of the foremost tailoring boutiques in New York City. BBT was founded by Plaintiff Torres, a master tailor who has devoted his entire professional career to growing BBT into the go-go tailor for New York City and beyond.

3. For years, Defendant James Barchiesi ("Barchiesi") took unfair advantage of Mr. Torres and BBT through an elaborate scheme involving multiple companies, named as defendants herein.

4. Specifically, Barchiesi planned and carried out a scheme to defraud Plaintiffs by taking advantage of his position as owner and manager of the other Defendants, a web of integrated business management support companies known as Worksite, and persuading Plaintiffs to trust Defendants with their business and bank accounts.

5. The result of Defendants' fraudulent conduct was a combination of grossly negligent bookkeeping, accounting, tax reporting, and financial advisory and deliberate deception rising to the level of professional malpractice.

6. The malpractice of Defendants caused Plaintiffs to suffer substantial tax penalties and wasteful payments (i.e., borrowing money to make tax payments that BBT had the cash to pay) and to pay replacement accountants to take over and repair the damage caused by Defendants' malpractice.

7. In an attempt to cover up his misdeeds, Barchiesi claimed after the termination of Plaintiffs' relationship with Defendants that he was not aware of what Roth was doing and that Roth's president, Mr. Rankin, was acting on his own or in ways unknown to Barchiesi. Such statements were false, and Barchiesi knew they were false when he made them, as Barchiesi installed Mr. Rankin in Ledgerworx and then created Roth to appear to be a separate and stand-alone accounting firm.

8. Barchiesi, directly and through the other Defendants, defrauded Plaintiffs, breached his fiduciary duty to Plaintiffs, breached their contracts with Plaintiffs, and caused financial harm to Plaintiffs.

9. What makes Barchiesi's misdeeds particularly odious is that he represented to Plaintiffs that he and his companies were fiduciaries – financial advisors and consultants who and that would take care of Mr. Torres and BBT – whom and that Plaintiffs, who do not have financial backgrounds and who are not financially sophisticated, could trust.

10. Unfortunately, Mr. Torres and BBT did trust Mr. Barchiesi and his companies, to their financial loss.

11. The purpose of this lawsuit is to seek the recovery of that loss.

## THE PARTIES

12. Plaintiff Beyond Bespoke Tailors, Inc. ("BBT") is a corporation organized under the laws of the State of New York with a principal place of business located at 45 West 46th Street, New York, New York.

13. Plaintiff Nicholas Torres is an individual and a citizen of the State of New York who resides in Staten Island, New York.

14. Upon information and belief, Defendant James Barchiesi ("Barchiesi") is an individual who resides in the Commonwealth of Pennsylvania and the State of Virginia.

15. Upon information and belief, Defendant Worksite LLC ("Worksite"), is a limited liability company organized under the laws of the State of Pennsylvania with a principal of business located at 115 Imperial Dr East Stroudsburg, Pennsylvania.

16. Upon information and belief, Defendant Worksite Accountants and Advisors ("Worksite AA") is a limited liability company organized under the laws of the State of

3

Pennsylvania with a principal of business located at 24 N. 4th Street Easton Northampton, Pennsylvania.

17. Upon information and belief, Defendant Worksite Capital Partners, LLC ("Worksite Capital") is a limited liability company organized under the laws of the State of Pennsylvania with a principal of business located at 24 N. 4th Street Easton Northampton, Pennsylvania.

18. Upon information and belief, Defendant Worksite Interactive LLC ("Worksite Interactive") is a limited liability company organized under the laws of the State of Pennsylvania with a principal of business located at 24 N. 4th Street Easton Northampton, Pennsylvania.

19. Upon information and belief, Defendant Worksite Ventures LLC ("Worksite Ventures") is a limited liability company organized under the laws of the State of Pennsylvania with a principal of business located at 24 N. 4th Street Easton Northampton, Pennsylvania.

20. Upon information and belief, Roth & Associates ("Roth") is the fictious name of a business organization known as Ledgerworx, formed under the laws of the State of Pennsylvania with a principal place of business located at 256 S. Walnut Street, Bath, Pennsylvania.

21. Upon information and belief, Barchiesi indirectly owns Roth.

## JURISDICTION AND VENUE

22. Plaintiff commenced this action in the Supreme Court of the State of New York, County of New York, and was removed by Defendants to this Court.

23. This Court has diversity of citizenship jurisdiction of this matter pursuant to 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

4

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 a substantial part of the events and omissions giving rise to the claims set forth herein occurred in this District.

## THE FACTS

### A. The Barchiesi enterprise

25. The business entities named as Defendants were and are all part of a unified and integrated enterprise owned, organized, and managed by Barchiesi for the purpose of defrauding, among others, Plaintiffs.

26. As more fully detailed below, Barchiesi and other individuals acting on behalf of and at the direction of Barchiesi repeatedly assured Plaintiffs that Defendants were highly skilled, competent and experienced in bookkeeping, accounting, and tax reporting and would be able to provide such services to Plaintiffs.

27. Barchiesi and other individuals acting on behalf of and at the direction of Barchiesi also repeatedly assured Plaintiffs that Defendants were highly skilled, competent and experienced in financial planning.

28. Plaintiffs relied on Barchiesi' statements and trusted that Barchiesi and the other Defendants would act in the best interests of Plaintiffs because of the appearance of skill, competence and experience that Defendants created and because the social relationship that Barchiesi created with Mr. Torres essentially lulled Mr. Torres into trusting Barchiesi and the other Defendants.

29. Such reliance was reasonable, as Defendants held themselves out to be skilled, competent and experienced professionals who knew exactly what they were doing; Defendants also unfairly leveraged a social relationship between Barchiesi and Mr. Torres to dissuade Mr.

Torres from suspecting that Defendants were cheating Plaintiffs, even though that is exactly what Defendants were doing.

30. As more fully detailed below, it turns out, unbeknownst at all relevant times to Plaintiffs, that Defendants are not and were not skilled, competent or experienced in any of the areas they represented as their areas of skill, competence and experience.

31. Plaintiffs suffered tremendous financial harm as a result of their detrimental reliance on the truth of the representations made by Defendants and Defendants' breaches of their contractual and fiduciary obligations to Plaintiffs.

**B.     Defendants' fraudulent communications with Plaintiffs**

32. During the years 2015 – 2019, Barchiesi used several entities to mask fraudulent activity directed at and harming Plaintiffs.

33. Essentially, Barchiesi parlayed what started out as a social relationship between him and Mr. Torres into a relationship of trust and confidence in which Barchiesi was supposed to have provided financial advisory and accounting services to BBT and Mr. Torres individually.

34. Barchiesi, representatives of the other Defendants, and others on behalf of and, upon information and belief, at the direction of, Defendants corresponded with BBT and Mr. Torres in a concerted effort to defraud BBT and Mr. Torres.

35. The communications summarized in Paragraphs 38-56 below are a representative sampling of communications to and from Defendants and others acting on behalf of and, upon information and belief, at the direction of Defendants. This sampling is not intended to be an exhaustive summary of all such communications.

36. Prior to November 2015, Barchiesi persuaded Mr. Torres to allow Defendants to manage BBT's finances, handle its bookkeeping and accounting needs, and prepare and file their tax returns.

37. Barchiesi was able to persuade Mr. Torres to allow Defendants to handle Plaintiffs' financial and accounting by repeatedly promising to act as a fiduciary and touting the Defendants' expertise, experience, and competencies in the areas of bookkeeping, accounting, and tax reporting. Barchiesi also used the social relationship he had created with Mr. Torres to dissuade Mr. Torres from suspecting that Barchiesi and the other Defendants intended to defraud and damage Plaintiffs.

38. Thus, on November 30, 2015, Barchiesi confirmed in writing to Maria Guevara, then, upon information and belief, an employee of one or more of Defendants, that he had established an escrow account for BBT and acknowledged that Defendants would owe fiduciary obligations to BBT.

39. On December 21, 2015, Barchiesi forwarded information to set up a Simplified Employee Pension Individual Retirement Account ("SEP") for Plaintiffs and confirmed he would control the accounting for this account through an entity he controlled known as IRA Innovations; doing so was improper.

40. As an example of Defendants' role in providing tax advice to Plaintiffs, on January 7, 2016, one of Defendants' employees, acting on behalf of Defendants, identified in an email to Mr. Torres a discrepancy in tax monies owed by Mr. Torres to New York State.

41. Further proving Barchiesi's personal involvement in the financial affairs of Plaintiffs, on March 13, 2016, Barchiesi requested in an email to Mr. Torres that Mr. Torres pay his taxes directly and provided the amount that Mr. Torres should pay.

42. On March 22, 2016, in an email to Mr. Torres, Barchiesi confirmed that that he had "spoken to Nick [Torres] and Stacie and we will coordinating [sic] final payment of their 2014 Federal IRS. Bill. Please work with Stacie to alert her on escrow details and send a certified check copy to Nick for his records. Stacie, Please confirm when you are ready to close out payment."

43. On June 25, 2016, Maria Guevara, on behalf of Defendants, listed expenses being billed to BBT: "1. Taxes, 2. IRS Loan Repayment, 3. Marketing & Advertising Spend, 4. Accounting Fees."

44. In an email dated and sent on November 18, 2016, Barchiesi gave further instructions to his staff to establish an Individual Retirement Account for Mr. Torres.

45. As a further part of his scheme to gain and take advantage of Plaintiffs' trust, on May 8, 2017, Barchiesi requested in an email to BBT that BBT allow Barchiesi to set up an auto billing arrangement for tax and accounting work via bill.com.

46. Along the same lines, on June 7, 2017, Barchiesi provided Plaintiffs with an emailed summary of work that Barchiesi represented had been provided by the Defendants for Plaintiffs.

47. On October 5, 2017, Barchiesi confirmed in writing to Plaintiffs that Barchiesi was aware of and was monitoring BBT's tax situation, clearly and unequivocally assuring Plaintiffs that their tax filing needs were being addressed by Defendants.

48. On October 16, 2017, Barchiesi advised Paychex, a third-party payroll processor, in writing by email, that Barchiesi was BBT's "accountant." In that same email, Barchiesi requested Mr. Torres' W-2 Wage Statement and a Form 1095 supporting that he had health insurance for the year at issue.

8

49. On November 14, 2017, Barchiesi confirmed in an email to Mr. Torres Barchiesi's alleged personal involvement in the preparation of Plaintiffs' tax returns.

50. On April 4, 2018, Foster Rankin, upon information and belief a former president of Roth and acting on behalf of and at the direction of Barchiesi, requested a Power of Attorney to act on behalf of Plaintiffs, representing that he was a Certified Public Accountant.

51. Upon information and belief, Rankin was not, at the time, a Certified Public Accountant, Barchiesi knew that Rankin was not a Certified Public Accountant, was aware that Rankin had represented himself to Plaintiffs as a Certified Public Accountant, and did nothing to advise Plaintiffs that Rankin was not a Certified Public Accountant.

52. By an email dated and sent August 6, 2018, Barchiesi introduced Plaintiffs to Joseph Gil, whom Barchiesi represented worked with Barchiesi on what Barchiesi represented to Plaintiffs were "specialized matters especially as it relates to New York State Business Tax Issues."

53. On August 10, 2018, Barchiesi advised in an email to Plaintiffs that Roth, which Barchiesi actually owned and operated, managed and oversaw all tax matters for Plaintiffs. In that same email, Barchiesi represented that Defendants had filed Plaintiffs' tax returns and that Barchiesi had personally oversaw the work being done by the other Defendants for Plaintiffs.

54. On August 10, 2018, Barchiesi, by email, directed Alexander Cordova, who, upon information and belief, was employed by Defendants, to cancel all accounting work being done by Defendants for Plaintiffs.

55. On September 26, 2018, Plaintiffs confirmed with Barchiesi that Plaintiffs were terminating their relationship with Roth.

56. On October 2, 2018, Barchiesi confirmed in writing that (a) the accounting work that had been handled by Roth for Plaintiffs was being transitioned to another accounting firm. (b) Roth had handled Plaintiffs' tax filings for Tax Year 2016, (c) Roth had made substantial errors on Plaintiffs' tax returns, (d) Barchiesi was personally involved in the accounting work done by Defendants, and (e) Defendants are all part of a single, unified organization controlled by Barchiesi.

### B.  Defendants' gross negligence, malpractice, and overcharges

57. Defendants repeatedly made substantial errors in the preparation and maintenance of Plaintiffs' books and records, in the preparation and filing of Plaintiffs' tax returns, and in the financial advice they gave Plaintiffs.

58. Defendants' mistakes were the result of Defendants' failure to follow normal, accepted practices in the fields of bookkeeping, accounting, tax preparation, and financial advice.

59. The services that Defendants provided to Plaintiffs fell far below the standard of care and professionalism that is expected of those who offer such services and far below what would be expected of anyone offering such services.

60. Among other things, Defendants mis-applied accounting entries for payments, failed to record PayPal transactions made by BBT, mishandled New York State sales tax matters in that Defendants directed Plaintiffs to pay advance sales tax beyond what was required, began but did not finish tax returns, filed at least one tax return without estimates being paid, as is required, caused penalties to be assessed by governmental taxing authorities due to late payments that were the responsibility of Defendants to ensure were made properly, caused Ledgerworx to pay BBT taxes directly, even though Beyond Bespoke had adequate cash to do so and should have done so, mishandled the accounting for a BBT Simplified Employee Pension Plan, made

many substantial errors handling BBT's QuickBooks entries, advised Plaintiffs to borrow money to pay their taxes even though they had sufficient cash to support the required tax payments, failed to send out Form K-1s as required, and made many substantial mistakes in the BBT General Ledgers.

61. More specifically, Defendants failed to report the information contained on the 2016 Form K-1 they issued to Mr. Torres was not reported as required.

62. Although Mr. Torres requested one, Defendants failed to issue a 2017 Form K-1.

63. Defendants caused Plaintiffs to make a $42,000 tax payment for a $32,000 tax liability.

64. Defendants improperly caused Mr. Torres to report for Tax Year 2015 and 2016 income on schedule C, improperly recorded as professional fees & loan payable on BBT's income tax returns, and improperly established the aforesaid SEP.

65. Defendants repeatedly caused BBT to make late and miscalculated payments on New York State sales tax and thus caused BBT to incur late fees and other charges.

66. Mr. Torres received from Defendants a Form 1099-C for 2019 showing a false $40,784 discharge of a non-existent debt that Defendants knew was false; at no time did Mr. Torres incur such a debt. Despite due demand, Defendants failed to file a corrected 1099-C for $0 with the Internal Revenue Service to rectify the situation.

67. Defendants have known at all relevant times that Mr. Torres never incurred such a debt and yet issued written statements stating, falsely, the existence of such a debt. Moreover, Defendants have known at all relevant times that they were required to issue a corrected Form 1099-C yet failed to do so knowing that the failure to do so was going to cause Plaintiffs to suffer financial harm.

68. Barchiesi utilized Defendants, which he had organized into a multi-layer network of companies – companies nesting within one another, including Roth, which was supposed to be BB's accountants – to extract duplicate fee payments from Plaintiffs for the same work. The result of these duplicate fee payments was that Plaintiffs were overcharged.

**C.   Punitive damages are warranted**

69. Defendants' conduct, as outlined above and discussed below, was egregious and predatory and justifies the imposition of punitive damages.

70. An award Punitive damages will dissuade Defendants from taking advantage of other members of the public and is thus warranted.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Fraud)

71. Plaintiffs repeat and realleged Paragraphs 1-70 as if fully set forth in this Paragraph.

72. As outlined above, Barchiesi and other individuals who acted on behalf of and at the direction of Barchiesi repeatedly made written and oral statements to Plaintiffs that Defendants were highly skilled, competent and experienced in bookkeeping, accounting, tax reporting, and financial planning.

73. Defendants' statements as to their skill, competence, and experience were false; at no time were Defendants were highly skilled, competent and experienced in bookkeeping, accounting, tax reporting, or financial planning.

74. At the time Defendants made those statements to Plaintiffs, Defendants knew they were not true.

75. Plaintiffs relied on Defendants' statements as to Defendants' supposed skill, competence, and experience in bookkeeping, accounting, tax reporting, or financial planning.

12

76. Plaintiffs' reliance on such statements was reasonable, as Defendants held themselves out to be skilled, competent and experienced professionals who knew exactly what they were doing; Defendants also unfairly leveraged a social relationship between Barchiesi and Mr. Torres to dissuade Mr. Torres from suspecting that Defendants were cheating Plaintiffs, even though that is exactly what Defendants were doing.

77. At the time Defendants made those statements, they knew Plaintiffs would rely on Defendants' statements as to their skill, competence, and experience in bookkeeping, accounting, tax reporting, or financial planning.

78. Defendants made their statements as to their skill, competence, and experience in bookkeeping, accounting, tax reporting, or financial planning so that Plaintiffs would hire and pay fees to Defendants.

79. Defendants knowingly and falsely represented to Plaintiffs that they were obligated to pay fees that Defendants knew were duplicates and that amounted to overcharging.

80. As a direct and proximate result of their detrimental reliance on the knowingly false statements Defendants made as to their skill, competence, and experience in bookkeeping, accounting, tax reporting, or financial planning, Plaintiffs suffered financial damages in an amount to be proven at trial but believed to be in excess of $500,000.

### AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of fiduciary duty)

81. Plaintiffs repeat and realleged Paragraphs 1-80 as if fully set forth in this Paragraph.

82. Defendants purported to provide bookkeeping, accounting, tax reporting, and financial planning services to Plaintiffs.

83. The nature of the services that Defendants provided to Plaintiffs were such that they put Defendants in the position of being fiduciaries to Plaintiffs.

84. Defendants repeatedly acknowledged that they owed fiduciary duties to Plaintiffs.

85. Defendants deliberately failed to provide the level of professional service they agreed to and were required to provide so as to benefit themselves financially, knowingly made false statements to Plaintiffs that they knew Plaintiffs would rely on so as to benefit themselves (Defendants), acted in their own self-interest rather than in the best interests of Plaintiffs, took fees they knew they were not entitled to take, and caused Plaintiffs to incur substantial debt and expense, solely to benefit themselves.

86. In so doing, Defendants breached their fiduciary duties to Plaintiffs.

87. As a direct and proximate result of their breach of their fiduciary duties to Plaintiffs, Plaintiffs suffered financial damages in an amount to be proven at trial but believed to be in excess of $500,000.

### AS AND FOR A THIRD CLAIM FOR RELIEF
### (Breach of contract)

88. Plaintiffs repeat and realleged Paragraphs 1-87 as if fully set forth in this Paragraph.

89. Defendants agreed to (but did not) provide bookkeeping, accounting, tax preparation and filing services, and financial advice to Plaintiffs.

90. Plaintiffs agreed to pay Defendants for what should have been provide bookkeeping, accounting, tax preparation and filing services, and financial advice

91. Plaintiffs complied with all of their contractual obligations to Defendants.

92. Defendants failed to provide the services they agreed to provide.

93. As a direct and proximate result of their breach of their contractual duties to Plaintiffs, Plaintiffs suffered financial damages in an amount to be proven at trial but believed to be in excess of $500,000.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Promissory estoppel)

94. Plaintiffs repeat Paragraphs 1-93 as if fully set forth herein.

95. Plaintiffs were repeatedly promised by Defendants that Defendants would handle Plaintiffs' bookkeeping, accounting, and tax reporting work with skill and competence provided Plaintiffs made payments to Defendants in the form of fees.

96. Plaintiffs relied on the promises identified above because of the representations Defendants had made and because of the social relationship Barchiesi had built with Mr. Torres; such reliance was reasonable.

97. Plaintiffs' reliance on Defendants; promises, as aforesaid, was foreseeable and reasonable.

98. Plaintiffs suffered financial damage by relying on Defendants promises, as aforesaid.

99. As a direct and proximate result of the breach of promises by Defendants, Plaintiffs were damaged in an amount to be proven at trial but believed to be in excess of $500,000.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Quasi-Contract)

100. Plaintiffs repeat Paragraphs 1-99 as if fully set forth herein.

101. Defendants benefited from the fees Plaintiffs agreed to and did pay to Plaintiffs.

102. Defendants did not earn the fees that Plaintiffs paid to Defendants.

103. Defendants have failed to return the fees that Plaintiffs paid them and that they did not earn.

104. Upon information and belief, Defendants also benefited financially from the relationship they created with Plaintiffs by using that relationship as a marketing tool to attract other business and earn more fees.

105. The fees that Defendants earned from Plaintiffs and through the relationship they built with Plaintiffs were unearned and unjust.

106. The reasonable value of the fees that Defendants were paid by Plaintiff and on account of the relationship they built with Plaintiffs will be proven at trial.

107. Equity and good conscience demand that Defendants make restitution to Plaintiffs in an amount to be proven at trial but believed to be in excess of $500,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter Judgment awarding Plaintiff:

A. On their First Claim for Relief, compensatory damages in an amount to be proven at trial but believed to be in excess of $500,000, plus interest, punitive damages, and attorneys' fees.

B. On their Second Claim for Relief, compensatory damages in an amount to be proven at trial but believed to be in excess of $500,000, plus interest, punitive damages, and attorneys' fees.

C. On their Third Claim for Relief, compensatory damages in an amount to be proven at trial but believed to be in excess of $500,000, plus interest, punitive damages, and attorneys' fees.

D. On their Fourth Claim for Relief, On their First Claim for Relief, compensatory damages in an amount to be proven at trial but believed to be in excess of $500,000, plus interest, punitive damages, and attorneys' fees.

E. On their Fifth Claim for Relief, compensatory damages in an amount to be proven at trial but believed to be in excess of $500,000, plus interest, punitive damages, and attorneys' fees.

F. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all claims so triable.

Dated:  Katonah, New York
October 26, 2020

GordonLaw LLP

By: _____
Michael R. Gordon

*Attorneys for Plaintiffs*
51 Bedford Road, Suite 2
Katonah, New York 10536
Telephone   914.232.9500
Fax         914.992.6634
Email       mgordon@gordonlawllp.com